Ronald **PORTERFIELD,**
**Plaintiff-Appellant,**

v.

**BURLINGTON NORTHERN INC., a
Delaware Corporation,
Defendant-Appellee.**

No. 74–2278.

United States Court of Appeals,
Ninth Circuit.

March 25, 1976.

John C. Boylan (argued), Rerat, Crill, Foley & Boursier, Minneapolis, Minn., for plaintiff-appellant.

Robert C. Williams (argued), Seattle, Wash., for defendant-appellee.

## OPINION

Before KOELSCH and WALLACE, Circuit Judges, and TAYLOR,* District Judge.

WALLACE, Circuit Judge:

Porterfield slipped on an icy stair on the premises of Burlington Northern Inc. (railroad) on his way to work one Sunday night and sustained lower back injuries. He missed a substantial amount of work and underwent fairly extensive medical treatment, including surgery.

He brought this Federal Employers' Liability Act action to recover damages. At the end of the evidence, he moved for a directed verdict on the issue of the railroad's liability. This motion was denied and the jury returned a verdict for Porterfield in the amount of $1,706.15, exactly 10% of the stipulated lost wages. Porterfield then moved for a new trial which was denied. We affirm.

The weather had been inclement in Spokane for several days before the accident with snow and ice on the ground. On the day of the accident, there was a janitor on duty for the railroad from 6 a. m. to 2 p. m. There was no other janitor on duty until the next morning. He shoveled the ice and snow from the steps involved at the start of his shift and before leaving, he spread a "thick" application of rock salt on the stairs, which he said did a "good job." He thought that the amount of salt was sufficient to last until the next morning.

It snowed lightly from the early evening up to the time the accident occurred. Conditions were such to motivate Porterfield to shovel the walk in front of his house that evening. About 11 p. m., he drove to work. Although he customarily used the handrails when he anticipated a slippery condition, on the night of the accident he could not do so because his hands and arms were fully occupied holding galoshes, a lantern, coat, overalls and mittens. When he attempted to carry this load down the stairs to the locker room, he slipped and allegedly injured his back.

### I. Motion for Directed Verdict

The first issue concerns the trial judge's ruling on Porterfield's motion for a directed verdict brought at the end of the evidence. In his brief, Porterfield erroneously describes the issue as whether he "was entitled to an order directing that the . . . railroad . . . was negligent . . . ." He misstates the issue and that misstatement is critical. His motion was for a directed verdict not on the issue of negligence but on the issue of liability. The latter would require the district judge to conclude as a matter of law not only that the railroad was negligent, but also that Porterfield was not contributorily negligent.

In passing on Porterfield's motion, the district court was required to view the evidence most favorably to the railroad. *United States v. Hartley,* 99 F.2d 923, 925 (9th Cir. 1938). Without doubt, the evidence of Porterfield's contributory negligence was sufficient to go to the jury. There was evidence that the ice was hard to see and that anyone would have slipped, but Porterfield himself admitted that he was not paying close attention and could have been more careful. Others had observed the ice that evening. Porterfield said he did not see it but his credibility was an issue before the jury. Porterfield could have used the handrails if he had made two trips with the items in his arms.

Moreover, even if Porterfield's motion were for a directed verdict on the issue of the railroad's negligence, the evidence was not so conclusive as to require a directed verdict. Although the evidence showed that there was no janitor on duty after 2 p. m., the janitor testified that he spread salt on the steps thickly before he left in amounts that should have been sufficient to last until the next day. This should be

---

* Honorable Fred M. Taylor, Senior United States District Judge, District of Idaho, sitting by designation.

sufficient to present a jury question whether the railroad exercised due care. Thus the judge did not err in refusing to direct a verdict on the railroad's liability.

## II. Alleged Attorney Misconduct

█ The main issue raised by Porterfield concerns not the railroad's conduct, but the conduct of its counsel in cross-examining Dr. Weitz, one of the attending physicians. In preparation for trial, the railroad's lawyer allegedly discovered a record of an investigation of Dr. Weitz for certain questionable acts. One such was the use of a diathermy apparatus called a "diasol machine." Counsel's notes mistakenly indicated that this investigation had to do with the medcosonolator machine used in treatment of Porterfield by Dr. Weitz. Thus in cross-examination of Dr. Weitz, the following exchange occurred:

Q. . . . Isn't it a fact that medcosonolators have been banned by some hospitals?

A. No, sir.

Q. Isn't it a fact that the Pure Food and Drug Administration and the Federal Trade Commission have investigated the use and the usefulness of the medcosonolator and medcosonolator treatments?

A. I think you are talking about something else, sir. I hate to disagree with you, because it is being used in this area in all of the hospitals and the same machine that I am talking about is being used at St. Luke's Hospital, Sacred Heart Hospital, Deaconess Hospital, Holy Family Hospital, Spokane Valley Hospital, and by most of the physical therapists in this area.

Q. You are sure of that?

A. Yes, sir, I am sure because I have been in their offices and I have been in the offices of most of the physical therapists.

\*    \*    \*    \*    \*    \*

Q. Do you know who Donald Silverman is, an M.D.?

A. In Seattle?

Q. Yes.

A. Yes.

Q. Is he an expert in physical medicine?

A. He is one of them, there are many.

Q. Are you aware of Dr. Silverman's studies concerning the effect of medcosonolator treatments?

A. No, sir.

Porterfield claims that this constituted misconduct so prejudicial as to require reversal.

Although the railroad counsel improperly represented to the court that he could produce testimony to substantiate his onslaught on the use of the medcosonolator, the district judge later concluded that the misrepresentation was due to inadvertence rather than design. Even when Porterfield's attorney learned of the mistake, however, he did not request a mistrial. On the contrary, he stipulated to have the district judge instruct the jury on the issue as follows:

Members of the jury, the attorneys have agreed that I may advise you that although questions have been asked about the actions of government agencies in connection with the banning of the use of the medcosonolator, that no government agency has, in effect, acted to ban the use of medcosonolator.

That should have ended the medcosonolator episode but not so. Porterfield challenges the statement made by the railroad's attorney in argument:

As to the Pure Food and Drug Administration and the Federal Trade Commission, that is a matter that the Court has instructed you on, and any reason that I might give for making this inquiries would not be proper to divulge to you at this time.

Porterfield did not object to this argument at the time. Moreover, Porterfield's own attorney had invited the response in his opening argument:

I think he should explain, for instance, why he suggested that there was some action by the Pure Food and Drug Administration against the medcosonolator, and then stipulated that that, in fact, had not occurred. Why he said that no hospi-

tals here in Spokane used the medcosonolator—certainly we proved that the hospitals do; . . . .

While the railroad's counsel's response might have been articulated with more precision, we fail to see how Porterfield can object now to a response his own attorney provoked.

As we review the entire medcosonolator episode, it becomes obvious that Porterfield's attorney believed he had caught the railroad's attorney in an embarrassing position and, as a matter of trial strategy, decided to ride the horse for all it was worth rather than attempt to start anew. The lack of objections and failure to move for a mistrial at any time are ample evidence that a trial strategy decision had been reached. That it was, in hindsight, the wrong decision is not a ground for reversal.

### III. Apportionment of Damages

■ The final issue which requires our attention pertains to the amount of the award. Porterfield urges that the verdict was "manifestly inadequate." The question is not, however, whether we think the award was low but whether the district judge abused his discretion in denying Porterfield's motion for a new trial. *Ward v. Buehler,* 472 F.2d 1170, 1171 (5th Cir. 1973). The issue was squarely presented before the district judge at that time and was fully argued. Porterfield has a substantial burden to demonstrate that the trial judge's discretion was abused. *Southern Pacific Co. v. Guthrie,* 186 F.2d 926, 933 (9th Cir.) (en banc), *cert. denied,* 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343 (1951). We conclude that he has not met it.

■ At first blush, a verdict this small in this case raises a serious question. Lost wages were stipulated to be $17,061.52. There was no evidence of medical special damages. However, there is no contention by the railroad that the resultant injury which is the subject of this suit was not caused by the slip and fall. The post-accident diagnosis was low back pain, acute bilateral sciatica, acute trauma of the spine and a possible lower spine problem. A ruptured intervertebral disc was not ruled out. After conservative treatment, Porterfield was referred to a neurosurgeon. Subsequent to a myelogram, surgery was performed, resulting in removal of discs at two levels in the low back. Recovery might well be incomplete and Porterfield still complains of subjective symptoms referable to the low back and the right lower extremity.

Given these injuries, not granting a new trial might well be an abuse of discretion but for two aspects of the case which must be considered when evaluating the trial as a whole. First, damages frequently depend upon whether the jury believes the plaintiff. This is especially true where the plaintiff has subjective complaints of pain and claims an inability to perform certain tasks. Although there may be objective signs to corroborate the plaintiff's claim, the end result will largely depend upon the extent to which the jury believes him.

We cannot say that the credibility of Porterfield was not in issue. The question was presented by the evidence of his dealings with his physicians and the railroad claims agent. The most significant episode, however, involved a three-day fishing trip Porterfield took to Astoria in latter August and early September of 1973. This trip involved 11 hours in an automobile on one day and 8 hours on a fishing boat the next. Prior to taking this trip, he reported to his employer that he would not be able to work on account of his old injury. At trial, however, Porterfield testified: "[W]hen I am too sore to work, I don't want to drive. My mind is on my back." He also stated: "[I]t is hard for me to sit very well in an automobile, or any place, in one position for over an hour or so." In final argument Porterfield's counsel acknowledged that his client had been untruthful with the railroad company about being off duty at the time of the fishing trip on account of his old injury.

Second, the ultimate damages depend on the degree of negligence Porterfield may have contributed to the whole accident as compared with that of the railroad. Be-

cause the verdict is a general one, we do not know what percentage of the negligence causing the accident the jury allotted to Porterfield. Certainly the jury found that Porterfield's negligence was substantial. The district judge, in ruling on the motion for new trial, commented that he would have found differently from the jury ". . . but the jury's verdict has been returned, they have measured, in accordance with the instructions, the contributory negligence . . . [.] I feel that there is not sufficient [inadequacy] here to cause me to feel that I should set it aside, so I will deny the motion for a new trial."

Porterfield contends that the jury considered only the stipulated lost wages as damages and then awarded him 10 percent of that amount. He claims that the jury's failure to award anything for his laminectomy and his pain and suffering demonstrates reversible error. The premise of this argument must necessarily be, however, that the jury allotted 90 percent of the negligence to Porterfield. The jury could just as well have added an award of general damages to the lost wages and then allotted 95 percent or more of the negligence to Porterfield. We cannot, by way of speculation, pierce the general verdict to draw the conclusions contended for by Porterfield.

Therefore, we do not find that Porterfield has sustained his burden to demonstrate that the district judge abused his discretion in denying the motion for new trial. The remaining questions raised do not merit specific discussion.

AFFIRMED.